NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-518

STATE OF LOUISIANA

VERSUS

KENNETH RAY BILBO, II

**********
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 11903-07
HONORABLE D. KENT SAVOIE, DISTRICT JUDGE
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Elizabeth A. Pickett, Judges.

AFFIRMED.

John F. Derosier, District Attorney
Carla S. Sigler, Assistant District Attorney
1020 Ryan Street
Lake Charles, LA 70601
(337) 437-3400
COUNSEL FOR APPELLEE:
      State of Louisiana

James E. Beal
Louisiana Appellate Project
P.O. Box 307
Jonesboro, LA 71251-0307
(318) 259-2391
COUNSEL FOR DEFENDANT/APPELLANT:
      Kenneth Ray Bilbo, II

**COOKS, Judge.**

In this criminal case, the Defendant alleges the evidence was insufficient to support his conviction for second degree murder. For the following reasons, we affirm his conviction.

<u>                                </u>**FACTS AND PROCEDURAL HISTORY**

On the night of January 29, 2007, Defendant, Kenneth Ray Bilbo, II, Roderick "Rocky" Syas, and three other young males gathered to celebrate the birthday of a friend, Raysean Marsh. They drove around in the middle of the night, drinking alcoholic beverages and listening to music. There was conflicting testimony as to whether illegal drugs were used. At some point, they stopped near a boat launch on the north side of Lake Charles. Defendant and Mr. Syas got out and walked toward the dock, which was a very dark area.

Shortly thereafter, the other men then heard multiple gunshots, and Defendant emerged from the darkness with a pistol in his hand. It was later discovered that Mr. Syas was shot and killed. Everybody got back in the car, with Defendant in the driver's seat. He raised the pistol and allegedly asked, "Who seen something?" One of the men, Anthony Weldon, replied, "Man, I didn't see shit," then they drove away. The two other men in the car, Adolph DeJean and Marsh, testified that Defendant pointed the gun at them after he got back in the car.

According to Weldon, they stopped at a Walgreens, where Defendant sent Weldon in to buy lighter fluid. Then they went to Weldon's house, which was nearby. Defendant went out back and burned his jacket and shoes, then left soon thereafter. Marsh testified Defendant stopped at the home of someone nicknamed "Taaka," to get rid of the weapon, then he and Taaka followed the others to Weldon's

house.  He further stated that he saw the other men around Weldon's barbeque pit, but thought they were just trying to get warm. DeJean testified the group drove straight to the house after the shooting, and he went to sleep on the sofa.

On June 1, 2007, a grand jury charged Defendant, with second degree murder, a violation of La.R.S. 14:30.1.  He was arraigned and after resolution of some pre-trial matters, including at least two substitutions of counsel, the parties began selecting a jury.

A trial was held and the jury eventually found Defendant guilty as charged. The trial court subsequently sentenced Defendant to life imprisonment.  Defendant now seeks review of his conviction.

## ANALYSIS

In his sole assignment of error, Defendant argues the evidence adduced at trial was insufficient to support his conviction.  Since none of the witnesses *saw* him fire the fatal shots, he notes the evidence is circumstantial; further, he argues there were inconsistencies among the witnesses' testimonies that left open reasonable doubt.  He also points out that Kermit Redmond, a man jailed on unrelated charges, testified that he, not Defendant, was the shooter.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review.  *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v.*

*Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The core of Defendant's argument appears to be that Redmond's testimony is more credible than that of Weldon, Marsh, and DeJean, or should have been accorded greater weight. Defendant argues the former's confession was direct evidence, while the three State witnesses mustered only circumstantial evidence that Defendant shot the victim. As noted earlier, he also alludes to inconsistencies in these witnesses' testimonies.

While there were inconsistencies as to what occurred after the shooting, Weldon, Marsh, and DeJean were consistent in stating that Defendant walked into the dark with the victim, they heard multiple shots, then Defendant returned alone. There is no dispute the victim's body was found floating near the dock in the same area; medical examination revealed he had suffered three fatal gunshot wounds. Thus, the facts presented to the jury formed a strong circumstantial case.

As Defendant notes, he presented the testimony of Kermit Redmond, who took the stand and claimed that he killed the victim. He stated that the victim took him to the crime scene at gunpoint, and he acted in self-defense. In his version of events, the three witnesses already discussed were not present. However, as the State observes, many of Redmond's recollections during cross-examination were vague or contradicted other testimony.[1] The following testimony from Redmond occurred on cross-examination:

Q     Did you see any structures out there at all?

---

[1]Also, Redmond acknowledged he could be facing life in prison, due to another charge.

A       I -- Mr. Kimball, I wasn't paying attention to no structures, to tell you the truth.

Q       And you are saying that he made you get out on the driver's side?

A       Yes, correct.

Q       But you don't know what kind of vehicle it was?

A       I don't.

Q       What did the seats look like?

A       I really couldn't tell you.

Q       Console?

A       What's a console, Mr. Kimball?

Q       Anything in between the two seats?

A       I don't know.  I really don't know.

Q       Where was it in the vehicle that you almost lost your gun?

A       When I was sliding on the other side to go through the door.

Q       So, it was a continuous bench seat you were sliding across?

A       Yes.

Q       And this is a newer vehicle?

A       I -- I don't know -- Mr. Kimball, I don't know whether it would be considered to be newer.  I just know that I slid across and was in the car.  I couldn't even tell you the color of it because I really don't know.

Q       Was there a dome light in that newer vehicle that he was in?

A       A dome light?

Q       Yes, sir.

A       Oh, I know what -- yes. Yes, it was.

Q       You didn't see it when the dome light was on and he was pointing it in your face?

A       No, sir, I didn't see what color it was.  I knew it was a gun.

Q       Now, that Browning you had, was it a revolver or semiautomatic?

A       Semiautomatic.

Q       How did you get that bullet into that chamber?

A       I bought the gun loaded. I couldn't load it because I don't know how.

Q       How many rounds did you shoot?

A       I don't know.  From when I bought it from the person he told me it had 15.  I don't know if it do or not, sir.  I sure shot him a lot of times.

Q       They only hold ten.  Brownings hold ten.

A       I don't know.  I am just telling you what I was told, Mr. Kimball.

Q       How many times did you shoot Roderick Syas?

A       Until the gun was empty.  I just shot him.

Q       Where did you shoot him?

A       Oh, I remember when I first shot him it was somewhere in the face area because his head pushed back.

Q       Where in the face?

A       I can't say.

Q       Where did you hit him next?

A       In the body, I guess. Mr. Kimball, I just shot him.

Q       No guessing. You were there.

A       Well, Mr. Kimball, like I'm saying, the first time I shot him, I'm feeling it was the face area because his head pushed back. After that I just --

Q       Now, we just had Dr. Welke testify yesterday that the last shot to Roderick Syas was the one in the face.

A       I don't know how.

Q       So, you are disagreeing with the forensic pathologist as to when he was shot first?

A       What I am saying is:  The first time I shot, that's what it appeared

to me because his head went back.

Q      It appears to you?

A      Yes, sir.

Q      Describe how he fell.

A      He fell backwards.

Q      Was he on the ground when you did the other shots?

A      There was no other shots when he was on the ground.

Q      I'm sorry?

A      There was no other shots when he was on the ground.

Q      All right. Tell us the sequence. You shoot him in the face. His head goes back. Where is the next shot?

A      The body.

Q      Where?

A      I don't know, Mr. Kimball. I can't say. I just know I emptied the gun. I don't know.

Q      Did he eventually fall?

A      Yes, sir, he did.

Q      Fell on his back?

A      Yes, sir, he did.

Q      And what was the surface like that he landed on? Was it the ground, dirt?

A      I don't know.

Q      You don't know?

A      I don't know.

Q      Grassy area?

A      Mr. Kimball, I don't know.

Q      You don't remember?

-6-

A    No, sir.

Q    You remember shooting a guy, and you don't remember anything. And you have said you pulled him into the water?

A    Yes.

Q    You don't know if it was grass, don't know if it was dirt. Was it wooden?

A    (No verbal response.)

Q    Don't know?

A    Not to my knowledge.

Q    Did you see anything wooden out there?

A    Just the wharf thing. I guess that's what it's called. It appears to be wood.

Q    But it didn't happen on the wharf?

A    No.

Q    You don't remember where? Do you remember how far away you were from the wharf or anything?

A    No.

Q    Were the lights still on, on the car, when y'all were out there?

A    The lights still on, the headlights --

Q    Yes.

A    -- or the inside?

Q    The headlights.

A    No.

Q    Headlights.

A    No, no.

Q    Turned them off. And you have never been out there before, not even before --

A    Not that I can remember.

Q      Now, do you remember July 21st, 2009, when Officer Marcus McCullough, who is the lead detective on your case with Daniel Kennedy, came out, talked to you to get a DNA swab from you?

A      At the jail?

Q      Yes, sir.

A      Yes.

Q      And you, of course, agreed to do that. . . . And do you remember him asking you about all of these letters you have been sending and claiming to have killed Roderick Syas and how you were giving inconsistent facts on your letters; and do you remember what your response was to him?

A      He never asked me anything about that.

Q      He didn't?

A      No.

Q      And you did not say to him; Man, you know how it is.  I am just trying to help a brother out.

A      He never asked me anything about it.

On redirect, the State called Detective Marcus McCullough of the Lake Charles

Police Department, who testified regarding his interview of Redmond:

A      I just asked him, I said, J.J., what's up with these letters?  I said, you are trying to confess to something, but you can't keep your story straight in each one of these letters you keep sending me.  I said, I know you didn't do this.  What's up with all these?

He said, oh, just trying to help a brother out.

And that was the only statement he made, and he wouldn't comment on it any further.

The jury obviously gave greater credence to the testimonies of Weldon, Marsh,

and DeJean rather than that of Kimball. It is the role of the fact finder to weigh the

respective credibility of the witnesses, and we are not to second guess such credibility

determinations unless they are clearly contrary to the evidence.  When the evidence

is viewed in the light most favorable to the prosecution, there is little doubt a

-8-

"rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Accordingly, this assignment of error is without merit.

## DECREE

For the foregoing reasons, Defendant's conviction is affirmed.

**AFFIRMED.**

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.**